Ronald NUSSLE, Plaintiff–Appellant,

v.

WILLETTE, Correction Officer, and Porter, Correction Officer, Defendants–Appellees.

Docket No. 99–0387.

United States Court of Appeals, Second Circuit.

Argued: May 3, 2000

Decided: Aug. 24, 2000

96

Norman A. Pattis, Williams and Pattis, LLC, New Haven, CT, for Plaintiff–Appellant.

Gregory T. D'Auria, Assistant Attorney General, State of Connecticut (Richard Blumenthal, Attorney General, and Robert B. Fiske, III, Assistant Attorney General, on the brief), for Defendants–Appellees.

Before: CALABRESI, PARKER, and STRAUB, Circuit Judges.

STRAUB, Circuit Judge:

Appellant Ronald Nussle appeals from a judgment of the United States District Court for the District of Connecticut (Alan H. Nevas, *Judge*), dismissing his complaint for failure to exhaust administrative remedies. Nussle's appeal presents an issue of first impression in this Circuit:

whether the exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), encompasses claims for excessive use of physical force under the Eighth Amendment. Because we conclude that § 1997e(a) does not apply to allegations of particular instances of excessive force or assault by prison employees, we vacate the District Court's judgment and remand for reinstatement of Nussle's complaint.

## BACKGROUND

This action arises from Nussle's claim that he was wrongfully assaulted by corrections officers acting under color of law at the Cheshire Correctional Institute ("CCI") in Cheshire, Connecticut. Nussle has been an inmate at CCI, under custody of the Connecticut Department of Corrections ("DOC"), since May 1996. He alleges that from the time of his arrival at CCI, he was the target of a prolonged and sustained pattern of harassment and intimidation by corrections officers on account of his perceived friendship with the Governor of the State of Connecticut. Nussle complains of injuries arising from one particular violent incident during that period. According to Nussle, on or about June 15, 1996, defendants Willette[1] and Porter entered his cell, instructed him to leave the cell, and proceeded to beat him without apparent provocation or justification of any sort. The officers allegedly "placed [Nussle] against a wall and struck him with their hands, kneed him in the back, [and] pulled his hair. The plaintiff was beaten so badly he lost control of his bowels." Nussle claims that these actions were motivated by a sadistic intent to cause physical pain, and that the officers threatened to kill him if he reported the beating. As a result of the incident, Nussle asserts that he suffered bruises, lacerations, physical pain (including ongoing numbness in his right leg), and emotional distress.

On June 10, 1999, Nussle commenced this action against corrections officers Willette and Porter in their individual capacities. His claim under 42 U.S.C. § 1983 alleges that the officers violated his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment and his Fourteenth Amendment right to substantive due process.[2] Nussle also asserted pendent state law claims for assault and battery. In order to remedy his injuries, Nussle's complaint sought compensatory and punitive damages as well as attorney's fees and the costs of bringing this action. The defendants moved to dismiss Nussle's complaint on the ground that he had failed to exhaust administrative remedies. The District Court agreed and granted the defendants' motion, holding that the exhaustion requirement of the Prison Litigation Reform Act of 1995, Pub.L. No. 104–134, 110 Stat. 1321–66 (1996) ("PLRA") (codified at 42 U.S.C. § 1997e(a) (Supp.2000)), required Nussle first to exhaust DOC's administrative remedies before taking his § 1983 claim to court. This timely appeal followed.

## DISCUSSION

We review a grant of a motion to dismiss for lack of exhaustion de novo, taking as true all allegations in the complaint, and drawing all reasonable inferences therefrom in favor of the nonmoving party. See In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 58 (2d Cir. 1998). We must "vacate the dismissal unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." SEC v. U.S. Envtl., Inc., 155 F.3d 107, 110 (2d Cir.1998) (internal quotation marks omitted).

### I. Enactment of PLRA Exhaustion Requirement

As a general matter, exhaustion of state remedies, whether administrative or

---

1. The Attorney General claims that there is not, in fact, any correction officer at CCI named "Willette." Nussle has not, however, withdrawn the action as to this officer.

2. The District Court dismissed Nussle's substantive due process claim as redundant, and Nussle does not advance this claim on appeal.

judicial, is not a prerequisite to maintaining an action under § 1983. *See Patsy v. Board of Regents*, 457 U.S. 496, 508, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *see also Heck v. Humphrey*, 512 U.S. 477, 480, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *Doe v. Pfrommer*, 148 F.3d 73, 78 (2d Cir.1998). Statutory purpose and legislative intent support this presumptive rule of non-exhaustion. The "very purpose" of § 1983, the precursor of which first was enacted during Reconstruction as part of the Ku Klux Act of April 20, 1871, ch. 22, 17 Stat. 13, was "to interpose the federal courts between the States and the people, as guardians of the people's federal rights— to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (quoting *Ex parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 676 (1880)); *see Patsy*, 457 U.S. at 503, 102 S.Ct. 2557.

■ Nevertheless, exhaustion of state remedies may be required in those limited circumstances in which "Congress has carved out a specific exception to the general rule that exhaustion is not required." *Doe*, 148 F.3d at 78. The inmate exhaustion provision at issue in this case, 42 U.S.C. § 1997e(a), is an exception of this sort. This provision first was enacted in 1980 as part of the Civil Rights of Institutionalized Persons Act ("CRIPA"), Pub.L. No. 96–247, 94 Stat. 349 (1980) (codified as amended at 42 U.S.C. §§ 1997, 1997a–1997j (1994 & Supp.2000)), and was intended to be "only a narrow exception" to the general rule of non-exhaustion in § 1983 actions. *Patsy*, 457 U.S. at 508, 102 S.Ct. 2557 (1982) (refusing to require exhaustion for § 1983 claims not covered by the CRIPA exhaustion provision); *see also McCarthy v. Madigan*, 503 U.S. 140, 149, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (declining to extend § 1997e(a)'s exhaustion provision to *Bivens* actions). The pre-PLRA version of § 1997e(a) provided a discretionary mechanism by which courts could (but were not obligated to) require prisoners to exhaust state administrative remedies before asserting claims under § 1983.[3]

Section 803(d) of the PLRA added teeth to the § 1997e(a) exhaustion provision, affirmatively *requiring* prisoners to exhaust administrative remedies, whether federal or state, before bringing any federal claims "with respect to prison conditions."[4] The PLRA strengthened the § 1997e(a) exhaustion provision in three relevant respects. First, by its own terms the pre-PLRA exhaustion provision applied only to § 1983 claims, not to actions brought under other federal laws. *See, e.g., McCarthy*, 503 U.S. at 150, 112 S.Ct. 1081. The

**3.** Before the PLRA went into effect, the exhaustion provision of § 1997e(a) read as follows:

§ 1997e. *Suits by prisoners*
(a) Applicability of administrative remedies
    (1) Subject to the provisions of paragraph (2), in any action brought pursuant to section 1983 of this title by an adult convicted of a crime confined in any jail, prison, or other correctional facility, the court shall, if the court believes that such a requirement would be appropriate and in the interests of justice, continue such case for a period of not to exceed 180 days in order to require exhaustion of such plain, speedy, and effective administrative remedies as are available.
    (2) The exhaustion of remedies under paragraph (1) may not be required unless the Attorney General has certified or the court has determined that such administrative remedies are in substantial compliance with the minimum acceptable standards promulgated under subsection (b) of this section or are otherwise fair and effective. 42 U.S.C. § 1997e(a) (1994) (amended 1996).

**4.** The amended version of § 1997e(a) reads as follows:

§ 1997e. Suits by prisoners
(a) Applicability of administrative remedies
    No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. §. 1997e(a) (Supp.2000) (as amended by PLRA § 803).

amended provision, by contrast, applies to any federal claim brought "with respect to prison conditions." 42 U.S.C. § 1997e(a). Second, the pre-PLRA provision was not mandatory upon courts. Rather, it simply *authorized* courts to invoke exhaustion, at their discretion, if requiring exhaustion "would be appropriate and in the interests of justice." 42 U.S.C. § 1997e(a)(1) (1994) (amended 1996). In so doing, a court was permitted only to "continue" the action for up to 180 days, not to dismiss the action outright. *See McCarthy,* 503 U.S. at 150, 112 S.Ct. 1081; *Patsy,* 457 U.S. at 510–11, 102 S.Ct. 2557. The PLRA, however, requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all. Third, exhaustion under the pre-PLRA version of § 1997e only could be required if two conditions were met: (1) if the available administrative procedures were "plain, speedy, and effective"; and (2) if the Attorney General certified, or the court itself determined, that the prison's grievance provisions substantially complied with minimum acceptable standards set forth by the Attorney General or were "otherwise fair and effective." *See Patsy,* 457 U.S. at 510–11, 102 S.Ct. 2557. The PLRA, on the other hand, does not make "effectiveness" of administrative remedies a precondition to the exhaustion requirement.

■ At the same time that it expanded the scope of CRIPA's exhaustion provision, the PLRA also explicitly limited its applicability only to federal actions that are brought "with respect to prison conditions"—a qualification on the scope of the exhaustion provision not found in the pre-PLRA version of § 1997e(a). Therefore, analysis of whether the amended version of § 1997e(a) applies to excessive force or assault claims must account for the manner in which the PLRA broadened the scope of this provision as well as the manner in which it simultaneously limited that scope. Both aspects of this amendment, in other words, must be presumed to have

"real and substantial effect," *Stone v. INS,* 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995), so as not to render statutory language superfluous. *See Baskerville v. Goord,* No. 97 Civ. 6413, 1998 WL 778396, at *3 (S.D.N.Y. Nov.5, 1998); *see also Ratzlaf v. United States,* 510 U.S. 135, 140–41, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (courts should avoid interpreting statutory language in a manner that renders other textual provisions superfluous or unnecessary).

■ We interpret the amended version of § 1997e(a) against the background principles that govern exhaustion of administrative remedies generally, *see United States v. United States Gypsum Co.,* 438 U.S. 422, 437, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ("Congress will be presumed to have legislated against the background of our traditional legal concepts"); *United States v. Figueroa,* 165 F.3d 111, 115 (2d Cir.1998), and in light of the interpretive principle that statutory exceptions are to be construed "narrowly in order to preserve the primary operation of the [general rule]." *Commissioner v. Clark,* 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989); *see also Patsy,* 457 U.S. at 508, 102 S.Ct. 2557 (exhaustion provision in § 1997e(a) is intended to be "only a narrow exception" to the general rule of non-exhaustion in § 1983 cases); *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 731–32, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) (narrowly interpreting statutory exception in Fair Housing Act); *Tasini v. New York Times Co.,* 206 F.3d 161, 168 (2d Cir.2000) (narrowly interpreting statutory exception in Copyright Act).

## II. Applicability of § 1997e to Excessive Force or Assault Claims

Whether or not assault or excessive force claims are subject to the amended version of the § 1997e(a) exhaustion requirement turns entirely on whether such claims fall within the category of actions "brought with respect to prison conditions" covered by that provision. If particular

incidents of assault or the use of excessive force do not constitute "prison conditions" within the meaning of the statutory text, then Nussle's § 1983 claim should not be subject to the exhaustion requirement. Conversely, if claims for particular instances of assault or excessive force *are* properly considered claims "brought with respect to prison conditions," then Nussle must fulfill § 1997e(a)'s requirement that he exhaust "such administrative remedies as are available"[5] before taking his federal claims to court. 42 U.S.C. § 1997e(a). The issue is one of first impression in this Circuit. *See Liner v. Goord*, 196 F.3d 132, 135 (2d Cir.1999) (declining to resolve the "complex legal issue[ ]" of whether § 1997e(a)'s exhaustion requirement encompasses particular claims for excessive force).

■ Courts have divided over whether excessive force and assault claims are encompassed within this provision. *See id.* (noting split in authority). A number of courts that have analyzed the issue, including the Third and Sixth Circuits, have concluded that § 1997e(a) does encompass such claims.[6] *See Booth v. Churner*, 206 F.3d 289, 293–98 (3d Cir.2000) (excessive force claims are actions "brought with respect to prison conditions" under § 1997e(a)), *cert. granted*, No. 99–1964 (Oct. 30, 2000); *Freeman v. Francis*, 196 F.3d 641, 643–44 (6th Cir.1999); *Cuoco v. United States Bureau of Prisons*, No. 98

Civ. 9009, 2000 WL 347155, at *3–*6 (S.D.N.Y. Mar.31, 2000); *Castillo v. Buday*, 85 F.Supp.2d 309, 312 (S.D.N.Y.2000); *Beeson v. Fishkill Correctional Facility*, 28 F.Supp.2d 884, 888–92 (S.D.N.Y.1998). However, a number of courts have held to the contrary. *See Tolliver v. Wilson*, No. 99 Civ. 9555, 2000 WL 1154311, at *4 (S.D.N.Y. Aug.14, 2000) ("prison conditions" does not encompass particular incidents of assault or use of excessive force); *Giannattasio v. Artuz*, No. 97 Civ. 7606, 2000 WL 335242, at *11–*12 (S.D.N.Y. Mar.30, 2000); *Wright v. Dee*, 54 F.Supp.2d 199, 205–06 (S.D.N.Y.1999); *Carter v. Kiernan*, No. 98 Civ. 2664, 1999 WL 14014, at *2–*5 (S.D.N.Y. Jan.14, 1999); *Baskerville v. Goord*, No. 97 Civ. 6413, 1998 WL 778396, at *2–*5 (S.D.N.Y. Nov.5, 1998); *Royster v. United States*, No. 98 Civ. 4109, 1999 WL 1567734, *3 (S.D.N.Y. Nov.23, 1999); *see also Peddle v. Sawyer*, 64 F.Supp.2d 12, 15–16 (D.Conn. 1999) ("prison conditions" does not encompass sexual assault). In light of the text, structure, and legislative history of the PLRA, we agree with those courts that have held that § 1997e(a) does not encompass particular instances of excessive force or assault.

*A. Statutory Text of § 1997e(a)*

■ In considering the proper scope of § 1997e(a), we begin by examining the

---

**5.** Since we conclude that Nussle is not obligated to exhaust administrative remedies based on the subject matter of his complaint, we need not address his additional contention that since the DOC administrative grievance procedures make no provision for the award of monetary relief, he is not subject to the exhaustion requirement because there is no administrative remedy "available" to him. We note, however, that other circuits have divided over this issue. *Compare Nyhuis v. Reno*, 204 F.3d 65 (3d Cir.2000) (exhaustion required); *Massey v. Helman*, 196 F.3d 727 (7th Cir.1999) (same), *petition for cert. filed*, No. 99–1918 (May 30, 2000); *Wyatt v. Leonard*, 193 F.3d 876 (6th Cir.1999) (same); *and Alexander v. Hawk*, 159 F.3d 1321 (11th Cir. 1998) (same), *with Rumbles v. Hill*, 182 F.3d 1064 (9th Cir.1999) (exhaustion not required), *cert. denied*, —— U.S. ——, 120 S.Ct. 787, 145

L.Ed.2d 664 (2000); *Whitley v. Hunt*, 158 F.3d 882 (5th Cir.1998) (same); *and Garrett v. Hawk*, 127 F.3d 1263 (10th Cir.1997) (same). *Cf. Perez v. Wisconsin Dep't of Corrections*, 182 F.3d 532, 538 (7th Cir.1999) (Easterbrook, J.) ("It is possible to imagine cases in which the harm is done and no further administrative action could supply any 'remedy.' ").

**6.** In addition, the Fifth and Tenth Circuits have required exhaustion in cases involving excessive force, but without explicitly considering whether such claims properly fall within the § 1997e(a) requirement. *See Wendell v. Asher*, 162 F.3d 887, 890–91 (5th Cir.1998); *Garrett v. Hawk*, 127 F.3d 1263, 1264–66 (10th Cir.1997).

text of the statute itself, since the language of a statutory provision, if clear and unambiguous on its face, is presumed to bear its plain meaning unless the text suggests an absurd result. *See Devine v. United States*, 202 F.3d 547, 551 (2d Cir. 2000) ("In the usual case, if the words of a statute are unambiguous, judicial inquiry should end, and the law is interpreted according to the plain meaning of its words."). When considering plain meaning, we nevertheless must also keep in mind context and the structure of the statute as a whole. *See, e.g., Miller v. French*, — U.S. —, — – —, 120 S.Ct. 2246, 2248–49, 147 L.Ed.2d 326 (2000); *see also Bailey v. United States*, 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) ("The meaning of statutory language, plain or not, depends on context." (internal quotation marks and citation omitted)); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (assessment of plain meaning must also look to "language and design of the statute as a whole").

The use in § 1997e(a) of the term "prison conditions," however, is scarcely free of ambiguity. Section 1997e(a) itself provides no definition of what constitutes a claim "brought with respect to prison conditions"—and neither does § 1997e(h), the definitional provision of § 1997e, or § 1997, which also defines terms used in § 1997e. The plain meaning of "prison conditions" in § 1997e(a) does not obviously encompass particular instances of excessive force or assault, as the defendants argue here—indeed, it actually suggests

the opposite. In the context of this statute, the term "conditions," used in its plural form, denotes "attendant circumstances" or an "existing state of affairs"— as exemplified by such ordinary phrases as "living conditions," "playing conditions," and "adverse weather conditions." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 473 (1961); *see also Booth*, 206 F.3d at 300–01 (Noonan, J., concurring and dissenting). In light of this definition of "conditions," the use of the term "prison conditions" in § 1997e(a) would appear to refer to "circumstances affecting everyone in the area affected by them," rather than "single or momentary matter[s]," such as beatings or assaults, that are directed at particular individuals.[7] *Booth*, 206 F.3d at 300–01 (Noonan, J., concurring and dissenting); *see also Carter*, 1999 WL 14014, at *3 ("The ordinary, contemporary, common meaning of the phrase 'prison conditions' refers to such things as medical treatment, food, clothing, and the nature and circumstances of the housing available in prison.").

### B. Relationship between 42 U.S.C. § 1997e(a) and 18 U.S.C. § 3626(g)(2)

■ While § 1997e(a) does not expressly define the term "prison conditions," similar language is used and explicitly defined in a different section of the PLRA, 18 U.S.C. § 3626(g)(2).[8] This definition, by its own terms, only applies to "this section"—*i.e.*, 18 U.S.C. § 3626. Nevertheless, the defendants urge that

---

**7.** As Judge Noonan observes, the only other variant to this definition of "conditions" that is relevant to the term's usage in this statute— "something needing remedy" (as used in the sentence, "Trains were late to New York because of conditions in New Jersey")—suggests the same connotation. WEBSTER'S THIRD INTERNATIONAL DICTIONARY, *supra*, at 473; *Booth*, 206 F.3d at 301 (Noonan, J., concurring and dissenting).

**8.** Title 18, section 3626(g)(2) of the United States Code provides:

(g) Definitions.—As used in this section—

. . . . .

(2) the term "civil action with respect to prison conditions" means any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

18 U.S.C. § 3626(g)(2) (Supp.1999) (as amended by PLRA § 802).

§ 1997e(a) should be read *in pari materia* with 18 U.S.C. § 3626, based on the interpretive canon that language "used in one portion of a statute ... should be deemed to have the same meaning as the same language used elsewhere in the statute." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *see also Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 45 (2d Cir.1988) ("Construing identical language in a single statute *in pari materia* is both traditional and logical."). Other courts have read the "prison conditions" language of § 1997e(a) *in pari materia* with the definition provided in 18 U.S.C. § 3626(g)(2). *See, e.g. Booth*, 206 F.3d at 294; *Freeman*, 196 F.3d at 643–44; *Beeson*, 28 F.Supp.2d at 888; *Giannattasio*, 2000 WL 335242, at *11–*12. *But see Carter*, 1999 WL 14014, at *3–*4 (declining to rely upon the § 3626(g)(2) definition to interpret meaning of "prison conditions" under § 1997e(a)). The text of § 3626(g)(2), however, is no less ambiguous than the text of § 1997e(a) itself—indeed, judges have reached opposite conclusions on whether § 1997e(a) encompasses excessive force and assault claims notwithstanding their common reliance on 18 U.S.C. § 3626(g)(2) for guidance. *Compare, e.g., Booth v. Churner*, 206 F.3d at 294–95 (opinion of the court) (excessive force claims are encompassed within the § 3626(g)(2) definition); *and Beeson*, 28 F.Supp.2d at 888–89 (same), *with Booth*, 206 F.3d at 301–02 (Noonan, J., concurring and dissenting) (excessive force claims do not fall within the definition in 18 U.S.C. § 3626(g)(2) and are therefore outside the scope of § 1997e(a)); *Baskerville*, 1998 WL 778396, at *4–*5 (same).

Section 3626(g)(2) encompasses two categories of civil actions: (1) those brought with respect to "conditions of confinement," and (2) those brought with respect to "the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2) (Supp. 2000). Section 3626(g)(2)'s reference to "conditions of confinement" is "no more apt" to include particular instances of assault or excessive force than the reference to "prison conditions" in § 1997e(a) itself. *Booth*, 206 F.3d at 301 (Noonan, J., concurring and dissenting). To characterize particular instances of assault or the use of excessive force as "conditions of confinement" clearly departs from normal, everyday use of the phrase, as the Third Circuit concedes and other courts apparently do not urge. *See id.* at 294, 296 n. 5 (opinion of the court) (excessive force claims "do not naturally fall into" category of actions "with respect to conditions of confinement"); *id.* at 301 (Noonan, J., concurring and dissenting) (statutory phrase " 'conditions of confinement' does not encompass specific batteries").

Instead, those courts requiring exhaustion have, without exception, placed excessive force and assault claims within the second category set forth in § 3626(g)(2), "effects of actions by government officials on the lives of persons confined in prison." *See, e.g., id.* at 294–95 (opinion of the court); *Beeson*, 28 F.Supp.2d at 888–89 (quoting and following *Moore v. Smith*, 18 F.Supp.2d 1360, 1363 (N.D.Ga.1998)). In so doing, however, these courts have simply assumed it to be self-evident that such claims fall within the scope of § 3626(g)(2)'s second category—with a typical example being the Third Circuit's broad reading of that phrase to include almost all actions by government officials that "affect the lives of prisoners similarly ... [by making] their lives worse." *Booth*, 206 F.3d at 295; *see also Beeson*, 28 F.Supp.2d at 888–89 (concluding, without analysis, that excessive force claims are included within the ambit of § 3626(g)(2)).

We disagree with the notion that particular instances of assault or excessive force self-evidently constitute "effects of actions by government officials on the lives of persons confined in prison" under the second category of § 3626(g)(2), since such awkward language would not, ordinarily, be used to describe such incidents. In his

dissent from the Third Circuit's decision in *Booth v. Churner*, Judge Noonan, sitting by designation, vividly argues this point:

> A guard hits you on the mouth. Would you report the blow by saying, "A government official has taken an action having an effect on my life?" No speaker of English would use such a circumlocution. Why should we attribute such circuitousness to Congress? When bones are broken or mouths are mauled, no one on earth, educated or uneducated, would use such roundabout phraseology to express the blow.

*Booth*, 206 F.3d at 302 (Noonan, J., concurring and dissenting); *see Giannattasio*, 2000 WL 335242, at *12 (holding that the use of excessive force does not constitute a "prison condition" in the ordinary sense of the term). The use of "roundabout phraseology," of course, does not necessarily end the inquiry, for Congress certainly "has a right to define one thing to mean something different from what it normally means." *Benjamin v. Jacobson*, 172 F.3d 144, 173 (2d Cir.) (en banc) (Calabresi, J., concurring), *cert. denied*, —— U.S. ——, 120 S.Ct. 72, 145 L.Ed.2d 61 (1999). Still, the "elephantine way" in which Congress drafted § 3626(g)(2), *Booth*, 206 F.3d at 302 (Noonan, J., concurring and dissenting), does signal the need for closer inquiry—for it is hardly certain that the text of the statute includes claims of excessive force or assault, at least not without further explanation.[9] *Cf. Benjamin*, 172 F.3d at 192 n. 35 (Calabresi, J., concurring) ("[I]f [a legislature] seems to say that a banana *is* an apple, we should not hesitate to try to figure out what it really meant to say.").

### C. Structure, Purpose, and Legislative History of the PLRA

Since the text of both 42 U.S.C. § 1997e(a) and 18 U.S.C. § 3626(g) are ambiguous, we turn to the structure and purpose of the statute as a whole, the legislative history of the PLRA, and the broader legal context for interpretive guidance concerning the meaning of "prison conditions" and the relationship between § 1997e(a) and § 3626(g)(2). *See McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991); *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (in addition to statutory language, courts must also look to the "design of the statute as a whole and to its object and policy" to determine the statute's meaning).

Sections 3626(g)(2) and 1997e(a), enacted by §§ 802 and 803 of the PLRA, respectively, advance distinct statutory purposes. While 42 U.S.C. § 1997e(a) is concerned with filtering out frivolous suits administratively, before they get to court, 18 U.S.C. § 3626—codified in an entirely different title of the U.S.Code—is concerned with the different purpose of preventing

9. It should be noted that § 3626(g)(2) explicitly excludes "habeas corpus proceedings challenging the fact or duration of confinement in prison" from its reach. 18 U.S.C. § 3626(g)(2). Superficially, this exclusion might suggest that Congress meant to divide the universe of civil actions brought by prisoners into two broad categories—(1) habeas corpus actions challenging the very fact or duration of imprisonment, which are excluded from § 3626; and (2) actions that do not challenge imprisonment as such, but some particular aspect of imprisonment—and meant to include this second category in its entirety. *Cf. McCarthy v. Bronson*, 500 U.S. 136, 139–40, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (relying on similar categorization of prisoners' actions to interpret 28 U.S.C. § 636(b)(1)(B), which authorizes nonconsensual referral of petitions brought by prisoners to magistrate judges); *Booth*, 206 F.3d at 295 (discussing *McCarthy* ).

However, the fact that habeas actions have been excluded from § 3626(g)(2) does not mean that all other claims that might be brought by prisoners are necessarily included by negative implication. Since it is hardly obvious that excessive force and assault claims fall within either of § 3626(g)(2)'s two categories, it remains necessary for us to interpret the breadth of these categories to determine whether such claims fall within the definition of "actions brought with respect to prison conditions"—and indeed, to determine whether § 3626(g)(2) should be relied upon to interpret § 1997e(a) at all.

"courts from micromanaging prison systems ... [and] usurping the authority given to prison administrators to decide matters of routine prison administration." *Baskerville*, 1998 WL 778396, at *4 (internal quotation marks, citations, and footnote omitted); *see also Benjamin*, 172 F.3d at 182 (Calabresi, J., concurring) (noting that by enacting § 3626, "Congress meant to get the federal courts out of the business of running jails").

In this light, the term "government officials" in § 3626(g)(2) is most plausibly understood to refer to administrative and policymaking officials, rather than those prison employees, such as the corrections officers alleged to have used excessive physical force against Nussle, who have day-to-day contact with inmates but no administrative or policymaking authority. *See Giannattasio v. Artuz*, No. 97 Civ. 7606, 2000 WL 335242, at *12 (concluding that the second category in § 3626(g)(2) refers to "acts of supervisory officials, such as the imposition of general rules and policies, that influence how a prison is run ... [and not] day-to-day interactions between prisoners and corrections officers"); *Baskerville*, 1998 WL 778396, at *4 (interpreting § 3626(g)(2) in light of that section's purpose to conclude that the definition "contemplates actions by prison officials that have broad effects on prison administration"). A similar use of the term "official" in a different part of the same section supports this conclusion. Section 3626(a)(3)(F), concerned with the prerequisites for the issuance of prisoner release orders, confers standing to oppose such release orders upon "[a]ny State or local official" whose "jurisdiction or function includes" the appropriation of funds for prison facilities; the construction, operation, or maintenance of those facilities; or the prosecution or custody of prisoners who might be released under such orders. *See, e.g., Ruiz v. Estelle*, 161 F.3d 814, 819–21 (5th Cir.1998) (discussing and interpreting § 3626(a)(3)(F)), *cert. denied*, 526 U.S. 1158, 119 S.Ct. 2046, 144 L.Ed.2d 213 (1999). As in § 3626(g)(2), this usage of

the word "official" quite clearly refers to those officials with administrative or policymaking responsibility.

An examination of cases in which § 3626 directly has been applied also reinforces this conclusion: the types of "government officials" who were defendants or parties to consent decrees in the institutional reform actions brought prior to the enactment of the PLRA routinely were senior policymaking or administrative officials. *See, e.g., Miller v. French,* —— U.S. ——, —— – ——, 120 S.Ct. 2246, 2250–51, 147 L.Ed.2d 326 (2000) (inmate class action initially brought against Indiana prison officials, including superintendent of correctional facility); *Ruiz v. Johnson,* 178 F.3d 385, 387 (5th Cir.1999) (inmate class action initially brought against Texas prison officials, including director of Texas Department of Criminal Justice and members of Texas Board of Criminal Justice), *abrogated by French,* —— U.S. ——, 120 S.Ct. 2246; *Benjamin,* 172 F.3d at 149–50 (seven class actions by pretrial detainees initially brought against New York City prison officials, including commissioner of corrections), *cert. denied,* —— U.S. ——, 120 S.Ct. 72, 145 L.Ed.2d 61 (1999); *Hadix v. Johnson,* 133 F.3d 940, 941 (6th Cir.) (inmate class action initially brought against "various state prison officials" in Michigan), *cert. denied,* 524 U.S. 952, 118 S.Ct. 2368, 141 L.Ed.2d 737 (1998); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 652 (1st Cir.1997) (class action by pretrial detainees initially brought against Massachusetts prison officials, including Suffolk County sheriff and Massachusetts corrections commissioner), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998); *Gavin v. Branstad,* 122 F.3d 1081, 1083 (8th Cir.1997) (inmate class action initially brought against "a number of Iowa state officials"), *cert. denied,* 524 U.S. 955, 118 S.Ct. 2374, 141 L.Ed.2d 741 (1998). Moreover, many of the institutional reform actions to which 18 U.S.C. § 3626 is addressed initially were brought as class actions. *See, e.g.,*

*Benjamin,* 172 F.3d at 149–50. By their nature, such aggregated claims target the actions of senior officials, and, indeed, the "prospective relief" that subsequently resulted typically took the form of consent decrees between plaintiffs and elected or appointed state officials or injunctions mandating action at the policymaking levels of the state or local government, not lower level government employees. *See, e.g., id.* (discussing consent decrees that were entered in actions brought by classes of pretrial detainees in mid–1970s). *See generally* Mark Tushnet & Larry Yackle, *Symbolic Statutes and Real Laws: The Pathologies of the Antiterrorism and Effective Death Penalty Act and the Prison Litigation Reform Act,* 47 DUKE L.J. 1, 12–22 (1997) (discussing the kinds of litigation in the 1970s and 1980s that catalyzed the political and judicial responses that ultimately resulted in the enactment of the PLRA).

██ We therefore decline the defendants' invitation to blindly import the 18 U.S.C. § 3626(g)(2) definition of "civil actions brought with respect to prison conditions" into 42 U.S.C. § 1997e(a) without regard to context and the distinct statutory purposes that these two provisions advance. *See Carter,* 1999 WL 14014, at *3–4; *Baskerville,* 1998 WL 778396, at *4. *Cf. French,* —— U.S. at ——, 120 S.Ct. at 2259 (automatic stay provision of § 3626(e)(2) "must be read not in isolation, but in the context of § 3626 as a whole"). And even to the extent that we may rely upon § 3626(g)(2), it stretches that provision's definition too far to characterize lower level government employees, such as corrections officers, as "government officials," since such a reading of the term "officials" would include just about any government employee without regard to level of responsibility or authority. *See Giannattasio,* 2000 WL 335242, at *12.

An examination of the legislative history of the PLRA suggests the same result. The PLRA's sponsors broadly categorized the bill's provisions as being divided into two major sets of provisions: (1) those aimed at deterring frivolous suits by inmates by raising the cost to prisoners of engaging in "inmate litigation fun-and-games" (garnishment procedure in amendment to *in forma pauperis* provisions; exhaustion provisions; revocation of good-time credits for frivolous suits; prohibition against suing for mental or emotional injury absent showing of physical injury); and (2) those that establish "some tough new guidelines for Federal courts when evaluating legal challenges to prison conditions ... [in order to] restrain liberal Federal judges who see violations of constitutional rights in every prisoner complaint and who have used these complaints to micromanage State and local prison systems." 141 CONG. REC. S14626 (daily ed. Sept. 29, 1995) (statement of Sen. Dole, Majority Leader of the Senate).[10] With respect to the first category, floor statements overwhelmingly suggest that the concern over "frivolous" suits in this context refers to subject matter, rather than to the factual merits of a claim that, if proven, would be meritorious. *See, e.g.,* 141 CONG. REC. S14418 (daily ed. Sept. 27, 1995) (statement of Sen. Hatch, Chair of Senate Judiciary Committee) (PLRA is designed to "help restore balance to prison conditions litigation and ... ensure that Federal court orders are limited to remedying *actual violations of prisoners' rights* ") (emphasis added); 141 CONG. REC. S14413 (daily ed. Sept. 27, 1995) (statement of Sen. Abraham) (providing examples of "frivolous" cases to be prevented as "insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and yes, being served chunky peanut butter instead of the creamy variety").

---

**10.** Senator Dole was an original co-sponsor of the PLRA. *See* 141 CONG. REC. S7524 (daily ed. May 25, 1995) (statement of Sen. Dole).

As revealed by this examination of statutory purpose and context, it is clear that particular instances of assault or excessive force were never meant to be included within the ambit of § 3626(g)(2) at all. In context, it makes little sense to apply the definition in § 3626(g)(2) to particular cases of assault or excessive force that do not contemplate ongoing judicial supervision or some other form of "prospective relief" affecting large numbers of inmates—let alone individual claims that complain of past, wholly completed conduct—since § 3626 does not even cover claims for compensatory money damages. *See* 18 U.S.C. § 3626(g)(7) ("the term 'prospective relief' means all relief other than compensatory monetary damages"). In addition to the rather "inept" use of language that would result from the defendants' interpretation, *Booth*, 206 F.3d at 302 (Noonan, J., concurring and dissenting), including particular claims of this sort would do nothing to advance the purpose of the section.

Consideration of the background Eighth Amendment principles against which Congress enacted the PLRA also supports this conclusion. Pre–PLRA Supreme Court decisions disaggregate the broad category of Eighth Amendment claims so as to distinguish between "excessive force" claims, on the one hand, and "conditions of confinement" claims, on the other. In *Hudson v. McMillian*, for example, the Supreme Court reiterated that because "contemporary standards of decency always are violated" by the malicious and sadistic use of force against prisoners, a less rigorous showing of injury was required for such claims than for conditions of confinement claims, for which "only those deprivations denying the minimal civilized measure of life's necessities" give rise to claims under the Eighth Amendment. 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal quotation marks omitted); *see also id.* at 11, 112 S.Ct. 995 ("To deny ... the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the concepts of dignity, civilized standards, humanity, and decency that animate the Eighth Amendment." (internal quotation marks omitted)); *see also Farmer v. Brennan*, 511 U.S. 825, 835–36, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (distinguishing "excessive force" and "conditions of confinement" claims as being subject to different *mens rea* requirements).

The principles underlying this distinction are equally applicable here. While § 1997e(a) filters through administrative grievance procedures "prison conditions" claims that may be frivolous as to subject matter, the text, structure, purpose, and legislative history of the PLRA provide ample justification for not treating excessive force or assault claims in the same manner. Especially in light of our obligation to construe statutory exceptions narrowly, in order to give full effect to the general rule of non-exhaustion in § 1983 cases, *see City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731–32, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995); *Patsy v. Board of Regents*, 457 U.S. 496, 508, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), we distinguish between "excessive force" and "prison conditions" claims for purposes of exhaustion under § 1997e(a) and conclude that exhaustion of administrative remedies is not required for claims of assault or excessive force brought under § 1983.

## CONCLUSION

We hold that Nussle was not required to exhaust DOC's administrative grievance procedures before bringing this action for excessive force and assault. We therefore REVERSE the District Court's judgment and REMAND for reinstatement of Nussle's complaint.